IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DR. JEFFREY MORGAN,

    Plaintiff,

v.                                                                                    No. 1:21-cv-01139-JHR-GBW

XAVIER BECERRA, Secretary,
Department of Health and Human
Services, Indian Health Service,

    Defendant.

**MEMORANDUM OPINION AND ORDER
DENYING PLAINTIFF'S MOTION TO AMEND AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

THIS MATTER is before the Court on Plaintiff Dr. Jeffrey Morgan's Motion for Leave to File Second Amended Complaint and Jury Demand, [Doc. 62] ("Motion to Amend"), and Defendant Secretary Xavier Becerra's Motion for Summary Judgment and Supporting Memorandum, [Doc. 79] ("Motion for Summary Judgment"). Having considered the briefing and relevant law, the Court denies Morgan's Motion to Amend and grants Becerra's Motion for Summary Judgment for the reasons stated below. Judgment in Becerra's favor shall be entered concurrent with this order.

    I.    **BACKGROUND AND PROCEDURAL HISTORY**

This is an employment discrimination case in which Plaintiff Dr. Jeffrey Morgan alleges that the Indian Health Service offered him a job and then revoked the offer because he is African American and a man. The relevant events span over six years, beginning with Dr. Morgan's application process in December 2016 through February 2018; his receiving and losing the job offer in March 2018; his administrative process before the Equal Employment Opportunity

Commission ("EEOC") from August 2018 through September 2021; this lawsuit, beginning in November 2021; and culminating in the filing of the two present motions.

      a.   *Dr. Morgan's Application and Tentative Offer*

In December 2016, Morgan applied to be an orthopedic surgeon at the Gallup Indian Health Center, an Indian Health Service hospital in Gallup, New Mexico. [Doc. 31, at 4]. The vacancy announcement stated that the applicant needed "5 years of residency training in the specialty of the position to be filled or equivalent experience and training." *Id.* at 2; MSJ Exh. A-1, at 2.[1] From December 2016 to December 2017, he spoke about the position with a recruiter for the Gallup Center, Helen Laughing-Hoskie; the Gallup Center's Chief Medical Officer until September 2017, Dr. Loretta Christensen; and the Acting Chief Medical Officer after Christensen, Dr. Kevin Gaines. [Doc. 31, at 4]. In his proposed Second Amended Complaint, Morgan describes this period as a "sorely delayed process" which "languished" as he "was taken back and forth through discussions about qualifications and fitness for the position." [Doc. 62-1, at 6]. Among his complaints was that he was required to resubmit his application at least twice – in February 2017 and later on in February 2018 – as the vacancy announcement was closed and renewed on the USA Jobs website each year.[2] *See id.* at 4, 5, 7; MSJ Exh. F, at 1; MSJ Exh. L, at 5.

In December 2017, Gaines invited Morgan to visit the hospital. [Doc. 31, at 4]. Morgan found his visit uncomfortable at times, particularly during an interaction he had with Christensen, which he described as "very brief," "caustic," and intended to make him "feel

---

[1] The documents attached to the Motion for Summary Judgment are referred to as the "MSJ Exhibits" ("MSJ Exh."), and the Court adopts Becerra's letter-number labeling scheme for them.
[2] Morgan also describes being asked to "re-apply (a third time)" by Dr. John York, but no other evidence references this application. *See* [Doc. 62-1, at 8]. Morgan also describes the credentialing process, discussed below, as a "5th application[.]" *Id.*

2

dismissed[.]" *See id.* In his proposed Second Amended Complaint, Morgan further alleges that he was treated dismissively by Chelsea Kettering, the Gallup Center's credentialing specialist, when she invited him into her office but said nothing to him for the 10 to 15 minutes he sat there. [Doc. 62-1, at 7]; *see also* MSJ Exh. C at 1, 4. In March 2018, the Indian Health Service tentatively offered Morgan a job as an orthopedic surgeon contingent on the results of the Service's background check and credentialing process. [Doc. 31, at 5]; MSJ Exh. A-3. Morgan accepted the tentative offer. [Doc. 31, at 5].

Around the same time, Kettering emailed Morgan to begin the credentialing process. [Doc. 79, at 5]; MSJ Exh. B, at 2; MSJ Exh. B-3. Part of the process required Morgan to submit several documents on a checklist, including a "Postgraduate Residency Certificate." [Doc. 79, at 5]; MSJ Exh. B, at 2; MSJ Exh. B-4, at 1. The checklist stated that the requested documents were "requirements for consideration of Appointment and Privileges" and that "[i]f an applicant does not meet the Governing Body's membership and privileging criteria . . . his or her application will not be processed[.]" MSJ Exh. B-4, at 1–2. According to Becerra, the residency certificate requirement was based on Article IV, Section 1.C.1.i of the Gallup Center's bylaws, which states that the "[m]inimum required documents for a complete application" for "Active Medical/Dental Staff" includes "a completion of residency certificate[.]" [Doc. 79, at 4]; MSJ Exh. B-2, at 3.

Morgan, however, did not submit a residency certificate. Instead, he sent two letters which he asserts should have satisfied the Gallup Center. [Doc. 79, at 5–6]; [Doc. 81, at 4]. The first letter was from the Chairman of Orthopaedic Surgery at Tulane University School of Medicine, stating that Morgan "completed a 12 month internship at Tulane University School of Medicine and 44 months of residency in the Department of Orthopaedic Surgery . . . (for a total

3

of 56 months of residency).” MSJ Exh. E-1. The second letter was from a physician at an orthopedic medical practice in Oregon explaining that Morgan worked there for about two months "as a [sic] orthopedic preceptee" after he left residency. *See* [Doc. 81, at 4, 34]. Kettering contacted Tulane's Residency Program Coordinator, who confirmed that the Tulane letter was real, that Tulane's residency in orthopedic surgery is 60 months long, and that Morgan left about four months shy of completion. MSJ Exh. E, at 1–2; MSJ Exh. E-2. Kettering then emailed Morgan asking for "an actual residency certificate," explaining that "[t]he certificate not only satisfies our (GIMC) requirements, but the requirements mandated by our third party payers in order to enroll you for procedure/service reimbursement in the State of New Mexico." MSJ Exh. E-3. Morgan called Gaines to talk about the situation, then sent an email to Gaines and Christensen stating his view that his "training completion letter . . . together with what is known of my practice surgical experience" satisfied the residency requirement. *See* MSJ Exh. F, at 2; MSJ Exh. F-1. Over both phone and email, Gaines remained firm that Morgan needed a certificate showing he completed residency to get the job. MSJ Exh. F, at 2–3; MSJ Exh. F-2. A few days later, Morgan's tentative offer was rescinded. *See* Exh. A-3.

      b.  *Morgan's Equal Employment Opportunity Commission Complaint and the Present Litigation*

In August 2018, Morgan filed a complaint with the EEOC in which he claimed that the Indian Health Service withdrew his job offer because of his race and sex. [Doc. 67-1, at 2]. The EEOC investigated Morgan's claims, which included taking Morgan's deposition. *See* MSJ Exh. H. In his deposition, Morgan confirmed that he did not complete his 60-month residency at Tulane and did not receive a residency certificate, then defended his decision to leave the program early. *See id.* at 2–3. The EEOC issued a final order permitting Morgan to sue in September 2021 and this case was timely filed in November 2021. *See* [Doc. 1]; [Doc. 31, at 5].

4

Morgan later amended his complaint to conform to the framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See* [Doc. 30, at 2–3]; [Doc. 31].  Both his Original and First Amended Complaints only made claims for racial discrimination.  *See* [Doc. 1, at 5–6]; [Doc. 31, at 6].

Now before the Court are two motions.  The first is Morgan's Motion to Amend, [Doc. 62].  In it, Morgan asks the Court to let him add sex discrimination claims alongside his race- and color-based claims; to bring claims directly against Christensen, Kettering, and Gaines, rather than Defendant Becerra; and to add many pages of specific allegations and statements not present in the First Amended Complaint.  *See generally* [Doc. 62-1].  Second is Becerra's Motion for Summary Judgment, [Doc. 79].  Becerra asks the Court to grant summary judgment in his favor because Morgan does not have evidence to show any genuine issue of material fact based on either alleged racial or sex-based discrimination.  *Id.* at 1.  Each side opposes the other's motion and briefing is complete for both, so the motions are ripe for decision.

## II.     RELEVANT LAW

### a.    *Discrimination in Employment based on Race and Sex under Title VII*

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against job applicants and employees based on their race or sex.  42 U.S.C. § 2000e-2(a)(1).  Job applicants who believe they have been unlawfully discriminated against can file a complaint with the EEOC, and if the EEOC does not take their case, applicants can sue the employer.  42 U.S.C. § 2000e-5(b), (f)(1).  The prohibition on discrimination, and the legal remedies for it, apply to federal government employers such as the Indian Health Service, which can be sued through its "head of the department, agency, or unit, as appropriate" – in this case, the Secretary of Health and Human Services.  *See* 42 U.S.C. § 2000e-16(a), (c).

5

To prevail on a Title VII employment discrimination claim, the applicant must prove that the employer's "*intent* to discriminate *based upon* the plaintiff's protected class characteristics was the determining factor for the allegedly illegal employment decision." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022) (quoting *Sanchez v. Phillip Morris, Inc.*, 922 F.2d 244, 246–47 (10th Cir. 1993)) (emphasis in original). To prove this, the plaintiff must present either direct or indirect evidence of unlawful discrimination. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000). Direct evidence plainly shows that an employment decision was reached for unlawful reasons, without need for inference or presumption. *Ford*, 45 F.4th at 1213. Plaintiffs who lack direct evidence must use the three-step *McDonnell Douglas* burden-shifting framework. *Id.* at 1215.

Under *McDonnell Douglas*, the plaintiff must first raise an issue of material fact on each element of a prima facie case. *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). The prima facie elements of a typical failure-to-hire claim are: (1) the plaintiff belongs to a protected class; (2) plaintiff applied and was qualified for a position which the employer sought to fill; (3) plaintiff was rejected despite being qualified; and (4) after the rejection, the position remained open and the employer continued to seek applicants with the plaintiff's qualifications. *Fischer v. Forestwood Co.*, 525 F.3d 972, 982–83 (10th Cir. 2008). Evidence of these facts raises a presumption that the employer rejected the plaintiff because of his protected characteristics. *See Bekkem*, 915 F.3d at 1267. The employer must then rebut the presumption by articulating a legitimate, nondiscriminatory reason for rejecting plaintiff's application. *Id*. Legitimate, nondiscriminatory reasons for rejecting an application include finding that the plaintiff was unqualified for the position based on subjective, nondiscriminatory criteria. *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1194 (10th Cir. 2000); *Burrus v. United Tel. Co.*

*of Kan.*, 683 F.2d 339, 342 (10th Cir. 1982). If the employer does this, the burden shifts back to the plaintiff to show a genuine dispute of material fact as to whether the employer's stated rationale was a pretext for unlawful discrimination. *Bekkem*, 915 F.3d at 1267.

"Reverse discrimination" plaintiffs, such as men who claim they were discriminated against because of their sex, face an additional hurdle. *See Notari v. Denver Water Dep't*, 971 F.2d 585, 588–89 (10th Cir. 1992). Rather than showing membership in a protected class, male sex discrimination plaintiffs must present direct or indirect evidence to "establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority" – that is, whose employment decisions are prejudiced against men.[3] *Id.* at 589. Failure to do so is a failure to make out a prima facie case under Title VII. *See id.*

   b. *Motions for Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment must be granted if the movant demonstrates that the nonmovant cannot prove an essential element of his case for which he would bear the burden at trial and the nonmovant fails to present contrary, admissible evidence for that element; this showing "necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The factual record, and all reasonable inferences therefrom, must be construed in the light most favorable to the nonmovant. *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty.*, 546 F.3d 1299, 1306 (10th Cir. 2008). That said, mere assertions are not enough – the

---

[3] Although *Notari* uses the term "majority," the Tenth Circuit has clarified that men who allege sex discrimination are treated as "reverse discrimination" plaintiffs not because they constitute a numerical majority, but because men are a "historically favored group" who have enjoyed sex-based favor relative to women. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1149 (10th Cir. 2008).

nonmovant must present evidence to show a fact issue.  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

   c. <u>Motions to for Leave to Amend a Complaint</u>

  After amending once before, "a party may amend its pleading only with the opposing party's written consent or with the court's leave."  Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  When amendment is opposed, leave should be denied if it would cause undue delay or pose an undue prejudice to the opposing party.  *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010).  Bad faith or dilatory motive by the movant, failure to cure deficiencies in earlier amendments, and futility of amendment are also grounds for denial.  *Id.*  Amendment is futile if the proposed amended complaint would be subject to dismissal for any reason, including that the amended complaint would not survive a motion for summary judgment or a motion for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239–240 (10th Cir. 2001); *see Adams v. C3 Pipeline Constr., Inc.*, 30 F.4th 943, 972 (10th Cir. 2021).  To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Finally, the complaint – original or amended – must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  "Each allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1).

   d. <u>Considerations for Pro Se Litigants</u>

  Morgan proceeds pro se – representing himself without legal counsel – so his pleadings "are to be construed liberally and held to a less stringent standard than formal pleadings drafted

8

by lawyers." *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  If his pleadings and briefing can be reasonably read to state valid claims on which he can prevail, they shall be read that way.  *Id.*  That said, the Court cannot assume the role of Morgan's advocate.  *Id.*

### III.   DISCUSSION

   a.  *Summary Judgment is Granted*

Becerra argues that the Court should grant summary judgment in his favor because Morgan was not qualified for the position to which he applied and thus cannot make out a prima facie case under *McDonnell Douglas*.  *See* [Doc. 79, at 12].  As discussed above, Title VII plaintiffs who lack direct evidence of unlawful discrimination must prove several elements which, taken together, raise a presumption that the employer wrongfully discriminated against them.  *See Bekkem*, 915 F.3d at 1267.  In failure-to-hire cases, one of these elements is that the plaintiff satisfied the objective qualifications of the job to which he applied.  *See Fischer*, 525 F.3d at 982–83.  Becerra argues that Morgan cannot prove this element because the Gallup Center requires all staff physicians to submit a residency certificate and Morgan did not submit one, so he was objectively unqualified.  [Doc. 79, at 12–13].

In response, Morgan argues that he was qualified and that the Gallup Center's residency requirement is merely a pretext for discrimination.  *See* [Doc. 81, at 2–5].  In support, he cites a U.S. Office of Personnel Management ("OPM") policy on "white collar occupations in the Federal Government," stating that "[t]he requirements included in a qualifications standard are only those essential for performing job duties."  [Doc. 81, at 3] (emphasis in document) (quoting *General Schedule Qualification Policies, General Schedule Operating Manual*, U.S. Office of Personnel Management, https://perma.cc/UR7Q-WNVV (May 2022)).  Morgan also cites several cases for the proposition that, although employers generally have discretion to set job

9

requirements, courts should not accept arbitrary or irrational criteria as valid grounds for adverse employment actions. *See* [Doc. 81, at 2–5]. In Morgan's view, his 56 months of residency training, two-month preceptorship, medical licensure, and subsequent years of experience as an orthopedic surgeon plainly show that he possesses the qualifications "essential for performing job duties" of an orthopedic surgeon at the Gallup Center. *See id.* at 4–5. Strict enforcement of the residency certificate requirement thus would have been so irrational that the Court should not believe Becerra's stated rationale. *See id.*

The law, however, favors Becerra. Morgan does not allege or present direct evidence of racial discrimination, so he must present enough evidence to raise a fact question on each element of his prima facie case under *McDonnell Douglas*. *See Bekkem*, 915 F.3d at 1267; *see generally* [Doc. 31]. This includes evidence that he met the objective qualifications for the position to which he applied. *See Fischer*, 525 F.3d at 982–83. Generally, employers have broad discretion to set reasonable, objective, uniform qualifications for jobs. *See York v. Amer. Tel. & Tel. Co.*, 95 F.3d 948, 954 (10th Cir. 1996). Federal government employers, such as the Indian Health Service, may set educational requirements for jobs in the competitive civil service "when the [OPM] decides that the duties of a scientific, technical, or professional position cannot be performed by an individual who does not have a prescribed minimum education." 5 U.S.C. § 3308. Such requirements must have a "rational relationship" with performance in the position to be filled and must not discriminate based on characteristics such as race, color, or sex. *See* 5 C.F.R. §§ 300.103(b)(1), (c). The OPM thus requires federal government physicians to be licensed, medically educated, and to complete up to five years of "graduate training in the specialty of the position to be filled," usually in the form of a residency program. *See Medical*

10

*Officer Series 0602, Physician Series* ("*Physician Series Requirements*"), U.S. Office of Personnel Management, https://perma.cc/KH3Y-WMRV (accessed July 22, 2024).

All evidence available to the Court suggests that Morgan did not satisfy the Gallup Center's objective, reasonable, uniformly applied qualifications for orthopedic surgeons. It is undisputed that Morgan did not complete residency, did not submit a residency certificate, and instead submitted a document which confirmed he did not complete residency. MSJ Exh. E, at 1–2; MSJ Exh. E-1; MSJ Exh. H, at 2–3. The Gallup Center's bylaws require applicants to submit "a completion of residency certificate" or "a letter from the director of the training program stating the applicant will have completed training satisfactorily by a certain date[.]" MSJ Exh. B-2, at 3. Even if Morgan was not given a copy of the Gallup Center's bylaws, the checklist he received stated the requirement, making clear that his tentative offer was conditioned on submitting a residency certificate. *See* MSJ Exh. B-4. Sworn statements by Kettering, Christensen, Gaines, and Laughing-Hoskie, all of whom are familiar with the Center's hiring and credentialing process, support Becerra's claim that the residency requirement is uniformly applied to all physicians. MSJ Exh. C, at 2, 4–5 ("A requirement for every provider is they need to complete an ACGME certified residency program and show proof of completion with a postgraduate residency certificate"); MSJ Exh. D, at 2–4; MSJ Exh. D-1, at 3 ("Ms. Kettering asked him for his residency certificate, which is required in Gallup"); MSJ Exh. F, at 3 ("For the past twenty-two years, GIMC has not waived the requirement that physicians complete their residencies for any orthopedic surgeons hired"); MSJ Exh. J, at 2. The only reasonable conclusion to draw from the evidence is that the Gallup Center does, in fact, require all its physicians to prove they completed residency and that Morgan's tentative job offer was rescinded because he did not. His case thus fails on the qualifications element.

11

Morgan's argument that he was qualified despite lacking a residency certificate is unpersuasive. Morgan asserts that the residency requirement was irrational and arbitrary in light of his experience and skill. *See* [Doc. 81, at 2–5]. It is true that employers cannot negate a Title VII plaintiff's prima facie case by inventing objective requirements which have "no bearing on the applicant's ability to perform the job[.]" *See Horizon/CMS Healthcare Corp.*, 220 F.3d at 1194. In such cases, the *Horizon* court held that plaintiffs need only to present credible evidence that they possessed the basic skills necessary to perform the job's duties. *Id.* But *Horizon* is distinguishable. In *Horizon*, pregnant employees were denied modified work assignments to accommodate their pregnancies because their employer only granted modified work assignments to employees who were injured on the job. *Id.* at 1189. The employer argued that its decision did not discriminate based on the employees' pregnancy status – and therefore their sex – because the injury requirement was objective and uniformly applied. *Id.* at 1192. The Tenth Circuit rejected this argument because there was no evidence – and the employer never argued – that the injury requirement was "an objective, performance-related qualification" necessary to "perform the modified-duty positions sought." *Id.* at 1194. The decision was also made against the backdrop cases like *York v. Amer. Tel. & Tel. Co.*, which recognized that employers have "wide discretion in setting job standards" and that "[a]s long as the qualifications offered by the employer are reasonable and have been consistently applied to all applicants for the position . . . there is no reason for the fact finder to supplant the employer's list of qualifications with its own." 95 F.3d at 954 (quoting *Hickman v. Flood & Peterson Ins., Inc.*, 766 F.2d 422, 425 (10th Cir. 1985)). *Horizon* thus stands for the proposition that employers have discretion to set and enforce reasonable, objective qualifications for jobs, but when a "qualification" is plainly arbitrary, it cannot be used to negate a Title VII plaintiff's prima facie case.

Morgan's case is different from *Horizon* because the objective qualification at issue – completion of residency – is reasonably connected to the duties of an orthopedic surgeon. Medical residencies are postgraduate clinical programs which educate and train physicians on how to practice a specialized area of medicine. *See* Brian J. Mckenna & Nancy K. Mckenna, *Workers Who Study or Students Who Work?*, 23 Tax'n Exempts 19, 19–20 (July/Aug. 2011) (describing typical residency programs). They are similar to other professional certification programs which the Tenth Circuit has held constitute valid objective qualifications in the Title VII context. *See, e.g., Gaskin v. Sci. Applications Int'l, Inc.*, 792 F. App'x 586, 589–590 (10th Cir. 2019) (holding that a training certification from the Federal Aviation Administration was a valid objective qualification for a job). The Gallup Center's enforcement of its residency requirement is also consistent with federal statutes and regulations, discussed above, which permit rational educational requirements for "scientific, technical, or professional" civil service jobs. *See* 5 U.S.C. § 3308; 5 C.F.R. §§ 300.103(b)(1), (c). And to the degree Morgan relies on the OPM's policies, they support Becerra's position, too. Under the heading "Evaluation of Candidates," the *Physician Series Requirements* states:

> Substitution of Experience for Residency Training: *Experience may not be substituted for residency training that is essential for the performance of specialized duties.* For example, specialists such as psychiatrists *and surgeons* must complete the number of years of accredited residency training required in their respective specialties. An exception may be made when a peer panel of physicians (subject-matter experts) determines and documents that the knowledge, skills, and abilities acquired in professional medical practice are equivalent to those acquired during the same period of time in a graduate training program.[4]

---

[4] Morgan asserts that the OPM's requirements can be satisfied "with a license OR certificate." [Doc. 81, at 4] (emphasis in original). This is incorrect. The policy requires both a license to practice medicine and completion of postgraduate training. *See Physician Series Requirements*.

(emphasis added). The policy clearly expresses a strong preference for residency completion and provides only a narrow exception to that rule. There is thus no support for Morgan's argument that the residency requirement was impermissible.

Even assuming Morgan could make a prima facie case, he presents no evidence to suggest the requirement was pretextual. When an employer articulates a legitimate, nondiscriminatory reason for rejecting an applicant, the plaintiff has the burden to show that the stated reason was a pretext. *Bekkem*, 915 F.3d at 1267; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "Plaintiffs typically show pretext by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003) (quoting *Morgan v. Hilti, Inc.*, 108 F.33d 1319, 1323 (10th Cir. 1997)). Morgan tries to show pretext by gesturing toward "the behavioral conduct, signal language and calamity of process directed toward and concerning the applicant's hiring process," apparently referring to the number of times he re-submitted his application, the length of time he waited to receive a tentative offer, and what he perceived to be cold treatment from Christensen and Kettering. *See* [Doc. 81, at 5]. But, in context with the rest of the evidence, a reasonable factfinder could not infer discriminatory intent from these facts. At best, they suggest that the Gallup Center's application process is cumbersome and that some of its employees were discourteous to Morgan on one occasion. Morgan also suggests that Gaines or Christensen rejected his letter from Tulane because it was signed by "a Latino surgeon," or that they disfavored his preceptorship letter because it was signed by "a Jewish American surgeon[.]" *Id.* at 4. But such bare, unsupported claims of racial malice are not evidence. Becerra, meanwhile, presents evidence from several

14

witnesses familiar with the matter and records maintained by the Gallup Center which all suggest that the Center's residency requirement is genuine and long-standing hospital policy. Morgan's pretext argument thus fails.

Morgan also argues that Becerra's Motion is untimely because it was filed more than 30 days after the close of discovery. *Id.* at 1–2. The argument misunderstands the Court's deadlines. Morgan is correct that, "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment(MSJ) [*sic*] at any time <u>until 30 days after the close of all discovery</u>." *Id.* at 1 (quoting Fed. R. Civ. P. 56(b)) (emphasis in document). But its most recent order resetting case management deadlines, the Court set a new deadline for the filing of dispositive motions, like motions for summary judgment – April 19, 2024. *See* [Doc. 60]. Becerra's Motion was filed and served on Morgan on April 19, so it was timely. *See* [Doc. 79].

In conclusion, Becerra's Motion for Summary Judgement shows that Morgan cannot raise an issue of material fact on the qualifications element of his prima facie case and Morgan's counterarguments present no contrary evidence. Becerra is thus entitled to summary judgment against Morgan's racial discrimination claim as a matter of law and his Motion will be granted. The Court turns next to whether Morgan should be allowed to amend his complaint.

b. *Amendment is Denied*

Morgan's Motion to Amend is denied because amendment is futile. The primary difference between Morgan's First Amended Complaint and his proposed Second Amended Complaint is that the Second Amended Complaint adds sex discrimination claims. *See* [Doc. 31, at 6]; [Doc. 62-1, at 19–24]. Proposed amendments can be denied as futile if the proposed amended complaint could not survive a motion to dismiss for failure to state a claim under Rule

15

12(b)(6). *See Adams*, 30 F.4th at 972. Under Title VII, male sex discrimination plaintiffs state a claim by alleging facts which, taken as true, plausibly raise an inference that the defendant employer is the kind of unusual employer who discriminates against men because of their sex. *See Notari*, 971 F.2d at 589. Plaintiffs can raise such an inference by alleging, for example, that the employer disproportionately hires women rather than men or that the employer treats men and women differently in similar circumstances. *See Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1534–35 (10th Cir. 1995) (holding that evidence which showed that plaintiff was the only white employee in an otherwise all-Hispanic workplace raised an inference of reverse discrimination); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006) (holding that male sex discrimination plaintiffs can raise an inference of reverse discrimination by producing facts "sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred" (quoting *Notari*, 971 F.2d at 590)); *see also Sparks v. Univ. of Colo.*, 2022 WL 1092141 at *7 (D. Colo., Apr. 12, 2022) (finding that allegations, if true, were sufficient to raise an inference of discrimination against men where a male plaintiff alleged that an employer did not interview him, three of the four interviewees were women, and the hired candidate was a woman).

Morgan's allegations do not raise an inference of reverse discrimination. His description of the Gallup Center suggests that multiple male and female physicians worked there, including Kevin Gaines, who was the hospital's Chief Medical Officer when Morgan was rejected. *See* [Doc. 62-1, at 6–8]; MSJ Exh. F, at 1. Nothing in his description of events suggests that the Gallup Center responds to job applications from women faster than it does for men or that it waives credentialing requirements for women but not for men. *See* [Doc. 62-1, at 4–15]. His only allegations which remotely suggest prejudice are that Christensen and Kettering – both

16

women – treated him coldly during brief interactions at the Gallup Center.[5] *See* [Doc. 62-1, at 6–7, 9] (describing the interactions). But a weak handshake and some uncomfortable silence does not support an inference that the Gallup Center discriminates against men. A reasonable person could not infer misandrist treatment or attitudes from these facts, so Morgan does not state a sex discrimination claim under Title VII.

And even if Morgan could raise an inference of unusual sex discrimination, his case would still fail because of he cannot satisfy the qualifications element. Amendment can be denied as futile if the proposed amended complaint would be denied on a motion for summary judgment. *Watson ex rel. Watson*, 242 F.3d at 1239–40. Discrimination claims based on *McDonnell Douglas*, whether based on sex or race, require plaintiffs to show that they were qualified for the position to which they applied. *See, e.g., Piercy v. Maketa*, 480 F.3d 1192, 1201 (10th Cir. 2007) (applying *McDonnell Douglas* elements to a sex discrimination claim). Discovery on the issue of qualifications has concluded, and, as discussed above, all the available evidence suggests that the Gallup Center reasonably and consistently requires its physicians to complete residency. *See, e.g.,* MSJ Exh. F, at 3. It is undisputed that Morgan did not. MSJ Exh. H, at 2–3. If he cannot prove the qualifications element of his racial discrimination claim, he also cannot prove it for a sex discrimination claim.

Other aspects of the proposed Second Amended Complaint warrant denial as well. Morgan's complaint must contain a short, plain statement of his claims. Fed. R. Civ. P. 8(a)(2). With 25 pages of allegations, legal argumentation, and stray opinions about the mental capacities

---

[5] Morgan also states that he "believes for the record" that one of Becerra's witnesses "is a pathological liar, a racist, a sexist and is likely infirmed with some level of dementia or dissociation who should not be working at all or at best without line of sight supervision at all times in her post for a U.S. federal agency hospital." [Doc. 62-1, at 12]. In addition to being unprofessional, the statement is baseless and conclusory. The Court thus gives it no weight in determining whether Morgan's allegations would raise an inference of discrimination against men. *See Iqbal*, 556 U.S. at 681 (holding that "the conclusory nature" of the respondent-plaintiff's allegations "disentitle[d] them to the presumption of truth").

of witnesses, Morgan's proposed Second Amended Complaint is neither "short" nor "plain." Title VII claims against the government must be brought against the head of the department or agency to be sued. 42 U.S.C. § 2000e-16(c). Morgan wishes, instead, to name Christensen, Kettering, and Gaines as defendants. [Doc. 62-1, at 19–24]. But his Motion does not explain why any of them are more suitable than current Defendant, Secretary of Health and Human Services Xavier Becerra, whose department encompasses the Indian Health Service. *See* [Doc. 62]. And, to the degree Morgan tries to state a hostile workplace claim, he has not shown that he exhausted his administrative remedies for it and thus cannot bring it. *See* 42 U.S.C § 2000e-5(e)(1); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018). For these reasons, too, amendment is denied.

## IV.   CONCLUSION

Based on the discussion above, the Court **DENIES** Plaintiff Dr. Jeffrey Morgan's Motion for Leave to File Second Amended Complaint and Jury Demand, [Doc. 62], and **GRANTS** Defendant Secretary Xavier Becerra's Motion for Summary Judgment and Supporting Memorandum, [Doc. 79]. Final judgment in Defendant Becerra's favor shall be entered concurrent with this order and the case shall be closed.

The parties are advised that, should they wish to appeal the Court's decision, they must file a notice of appeal no later than 30 days from the date on which judgment is entered in this case. Fed. R. App. P. 4(a)(1)(A). Parties may consult the Tenth Circuit's local rules and the Federal Rules of Appellate Procedure for details on how to raise and respond to an appeal.

**IT IS SO ORDERED.**

_____
Hon. Jerry H. Ritter
United States Magistrate Judge
Presiding by Consent